UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KIRK WINTERS,

                                    Plaintiff,

                                    DECISION AND ORDER

                                    18-CV-1049L

             v.

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
_____

**PRELIMINARY STATEMENT**

Plaintiff Kirk A. Winters ("Winters") appeals from a denial of his application for a period of disability and disability insurance benefits ("DIB") by the Commissioner of Social Security (the "Commissioner"). The action is one brought pursuant to 42 U.S.C. § 405(g) to review the Commissioner's final determination.

On May 21, 2015, Winters filed an application for DIB, alleging an inability to work since May 19, 2014. (Tr. 106, 117).[1] On November 2, 2015, the Social Security Administration denied Winters's application, finding that he was not disabled. (Tr. 124-35). Winters requested and was granted a hearing before an administrative law judge. (Tr. 138-52). Administrative Law Judge Stephen Cordovani (the "ALJ") conducted the hearing on December 21, 2017, at which both Winters and vocational expert Timothy Janikowski (the "VE") testified. (Tr. 53-105). In a decision dated February 28, 2018, the ALJ found that Winters was not disabled and was not entitled to DIB. (Tr. 12-27). On July 26, 2018, the Appeals Council denied Winters's request for a review

---

[1] References to page numbers in the Administrative Transcript (Dkt. # 12) utilize the internal Bates-stamped pagination assigned by the parties.

of the ALJ's decision, making the Commissioner's decision final. (Tr. 1-6). Winters then commenced this action on September 24, 2018, seeking review of the Commissioner's decision. (Dkt. # 1).

Currently pending before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. ## 9, 14). For the following reasons, Winters's motion (Dkt. # 9) is granted to the extent that this the matter is remanded for further proceedings, and the Commissioner's cross motion (Dkt. # 14) is denied.

## DISCUSSION

### I. Relevant Standards

Determination of whether a claimant is disabled within the meaning of the Social Security Act follows a well-known five-step sequential evaluation, familiarity with which is presumed. *See Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *see also* 20 C.F.R. §§ 404.1520, 416.920. The Commissioner's decision that a plaintiff is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002).

### II. The ALJ's Decision

Here, the ALJ applied the sequential analysis. At step one, the ALJ found that Winters had not engaged in substantial gainful activity since May 19, 2014 – the alleged onset date. (Tr. 14). At step two, the ALJ found that Winters had the following severe impairments: obesity, vertigo, migraine headaches, anxiety disorder, depressive disorder, right ear hearing loss, obstructive sleep apnea, and occipital neuralgia. (Tr. 14-15). At step three, the ALJ found that such impairments, alone or in combination, did not meet or medically equal a listed impairment in Appendix 1 to Subpart P of Part 404 of the relevant regulations (the "Listings"). (Tr. 15-16).

Next, the ALJ determined that Winters retained the residual functional capacity ("RFC") to perform sedentary work with the following limitations: frequent climbing of ramps and stairs; occasional bending, kneeling, squatting; no balancing or crawling; no ladders, ropes, or scaffolds; no working on uneven ground; no working around loud noises, unprotected heights, or moving mechanical parts; no operating heavy equipment or machinery; no accommodations[2]; off task up to 10% of the work day; no supervisor duties; occasional independent decision-making and changes in work routine and processes; no strict production quotas; and only frequent interaction with supervisors, co-workers, and the general public. (Tr. 16).

At step four, the ALJ found that Winters could not perform any of his past relevant work. (Tr. 20-21). Finally, at step five, the ALJ determined that based on the VE's testimony and Winters's age, education, work experience, and RFC, Winters could perform other jobs existing in significant numbers in the national economy, specifically, order clerk (DOT # 209.567-014), laminator I (DOT # 690.685-258), and bench hand (DOT # 715.684-026). (Tr. 21-22). Accordingly, the ALJ found that Winters was not disabled under the Act. (Tr. 22).

## III. <u>Winters's Contentions</u>

Winters contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and is the product of legal error. (Dkt. ## 9-1, 18). First, Winters argues that the ALJ failed to sufficiently develop the administrative record and relied on his own lay interpretation of the medical evidence in place of competent medical opinions in making the RFC assessment. (Dkt. ## 9-1 at 20-23; 18 at 2-6). Second, Winters contends that the ALJ

---

[2] It is not clear what this limitation means. However, at the administrative hearing, the ALJ's hypothetical to the VE, which was substantially adopted by the ALJ in formulating Winters's RFC, included "no accommodation visually." (Tr. 101).

mischaracterized the evidence of record in determining that Winters could maintain work activity on a regular and continuing basis. (Dkt. ## 9-1 at 24-29; 18 at 7-9).

IV. **Analysis**

I turn first to Winters's contention that by discounting all medical opinions in the record, the ALJ rendered an RFC based upon his own lay interpretation of the medical evidence. On this record, I agree with Winters.

"[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.) (quotations omitted), *report and recommendation adopted by* 2010 WL 4703591 (W.D.N.Y. 2010). "Accordingly, although the RFC determination is an issue reserved for the Commissioner, where the medical findings in the record merely diagnose the claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities, as a general rule, the Commissioner may not make the connection himself." *Oswald v. Comm'r of Soc. Sec.*, 2019 WL 2610711, *6 (W.D.N.Y. 2019) (alterations and quotations omitted); *accord Quinto v. Berryhill*, 2017 WL 6017931, *12 (D. Conn. 2017) ("An ALJ is prohibited from 'playing doctor' in the sense that 'an ALJ may not substitute his own judgment for competent medical opinion'") (citation omitted).

Here, as the Commissioner acknowledges, the ALJ discounted every medical opinion in the record. Initially, the ALJ analyzed various statements made by Dr. Lixin Zhang ("Zhang"), Winters's treating neurologist at DENT Neurologic Institute ("DENT"), who treated Winters for dizziness, sleep issues, headaches, and neuropathy. Relevant here, Zhang performed a "Balance Performance Evaluation" of Winters on September 29, 2014. (Tr. 614-15). The results of that

4

evaluation indicated that Winters had "difficulty in effectively utilizing information from vestibular system to maintain upright balance control," which could range from "a mild degree" to a "severe" degree. (Tr. 614).

As far as the resulting functional impact, Dr. Zhang provided a two-sentence opinion: "Individuals with impaired vestibular function perform normally on firm support surfaces and/or in the presence of strong visual cues. They will, however, experience instability on irregular surfaces, in low light conditions and in active visual environment." (*Id.*).

The ALJ gave this opinion "partial weight." (Tr. 20). Specifically, the ALJ gave "great weight to the majority of the statement as it [was] based on a treating relationship, thorough testing and [was] consistent with the overall record." (*Id.*). However, the ALJ gave "little weight" to the second sentence of the opinion because in his view, but without citing any record evidence, it was "not supported by the treating record or activity level." (*Id.*). In other words, the ALJ credited the first sentence of Zhang's opinion, and discounted the second sentence.

The ALJ also weighed statements by Zhang in May 2015 treatment notes and in a November 2017 letter pertaining to Winters's disability application. At an appointment on May 7, 2015, Zhang reported that Winters had been unable to work for the last year "because of dizziness and vertigo which continue[d] to get worse." (Tr. 650). Winters indicated that "[a]ny kind of activity like mowing the lawn" made him instantly dizzy and experience vertigo. (*Id.*). Zhang also detailed that Winters experienced stress, restless leg syndrome, and insomnia, none of which showed improved with medication. (*Id.*). At that time, Zhang opined that he did "not know anything further [he] c[ould] offer" to Winters, so he referred him to psychiatrist Dr. Sanjay Gupta ("Gupta") at DENT. (*Id.*). Zhang also opined that Winters could not "function working at this point," and indicated that he would support Winters's disability application. (*Id.*).

5

Almost two years later, on November 21, 2017, Zhang submitted a note in support of Winters's disability application. (Tr. 897-98). Zhang indicated that he had been treating Winters since September 2014, when Winters initially presented for chronic dizziness. (Tr. 897). Zhang detailed Winters's symptoms, which consisted of dizziness episodes lasting 10-15 minutes with nausea, headaches, and photophobia. (*Id.*). After testing, Zhang explained that Winters's dizziness "was diagnosed as a combination of migraine-associated vertigo and chronic subjective dizziness." (*Id.*). Zhang also indicated that Winters had a history of "underlying mood disorder and ha[d] a diagnosis of bipolar disorder," for which Winters was "still see[ing]" Gupta. (*Id.*).

Zhang also mentioned Winters's "severe occipital neuralgia," which caused headaches. (*Id.*). Zhang indicated that Winters's headaches were "responding to the occipital nerve blocks and [Winters had] been getting them every 6-8 weeks." (*Id.*). According to Zhang, as recently as November 9, 2017, Winters had reported constant dizziness, imbalance, headaches, and difficulty falling asleep, and had frequent nausea and vomiting. (*Id.*).

In Zhang's view, Winters's "problems [were] a combination of occipital neuralgia, chronic dizziness plus underlying mood disorders, [and] [Zhang] ha[d] not found the be[st] way to manage [the problems]." (*Id.*). Although Zhang indicated that medication helped manage Winters's pain and improve his symptoms, Zhang stated that Winters's "symptoms w[ould] certainly worsen with any kind of stress, including financial stress." (Tr. 897-98). Zhang therefore opined that "[n]eurologically, [he did] not believe [Winters] [was] able to work, plus his psychiatric problems," and that, in Zhang's view, Winters was "completely or totally disabled, which could be permanent." (Tr. 898).

The ALJ gave "little weight" to Zhang's 2015 and 2017 opinions. (Tr. 20). According to the ALJ, Zhang's statements were issues of disability reserved solely for the Commissioner, they

6

were inconsistent with the "overall treatment record," which "show[ed] normal physical examinations of [Winters]" (*id.* (citing Tr. 902-956)), and Winters's activity level "reflect[ed] abilities in excess" of those opined by Zhang (*id.* at 20).

In addition, the ALJ discounted the weight assigned to a letter written by Winters's treating physician, Dr. Ernesto Diaz-Ordaz ("Diaz-Ordaz"), in support of Winters's disability application. (Tr. 20). On November 21, 2017, Diaz-Ordaz indicated that Winters had been a "long-standing patient" who was diagnosed with "chronic right mastoiditis, conductive hearing loss of the right ear and multi-sensory dizziness." (Tr. 900). Diaz-Ordaz stated that Winters had "undergone multiple diagnostic tests and surgical procedures in an attempt to manage his condition," but that, in Diaz-Ordaz's view, Winters's "dizziness [was] disabling and he has been unable to work for the past several years." (*Id.*). Diaz-Ordaz opined that Winters had "maximized medical management" and there were "no additional surgical options available to him." (*Id.*). Diaz-Ordaz ultimately opined that although Winters was treatment compliant, he could not work due to his dizziness, and Diaz-Ordaz did "not expect any change or improvement in his condition." (*Id.*).

The ALJ gave this statement "little weight." (Tr. 20). In the ALJ's view, Diaz-Ordaz's opinion regarding Winters's level of disability was not consistent "with the overall treatment record or activity level, including [Winters's] ability to shop, cook, drive, go for walks, split wood, bow hunt and fish." (*Id.* (citing Tr. 393-442, 599-607, 902-56)).

Furthermore, the ALJ gave "little weight" to two opinions of Winters's treating nurse practitioner at DENT, Danielle Tabbi ("Tabbi"), ANP. (Tr. 20 (citing Tr. 827, 849)).[3] On November 28, 2016, Tabbi evaluated Winters for complaints of dizziness, gait abnormality,

---

[3] It appears that Tabbi subsequently changed her name to Danielle Grisanti. (*Compare* Tr. 827 (treatment note from November 2016, signed by Danielle M. Tabbi, ANP) *with* Tr. 824 (treatment note from June 2017, signed by Danielle M. Grisanti, ANP)). The ALJ refers to these notes as if written by the same person, and the Court will do the same, referring to the nurse, as the ALJ does, as Tabbi.

7

insomnia, headache, and bipolar disorder. (Tr. 847). At that time, Winters reported that he felt worse since his prior appointment on October 11, 2016, and that, on a regular basis, his stress had been causing him to wake up in the morning with feelings of nausea and vomiting. (*Id.*). Winters also stated that when his stress was high, his dizziness was "much more prominent" and made him feel unsteady and imbalanced, and that he experienced dizziness "everyday throughout the day." (*Id.*). His dizziness caused him to use a walking stick and to sleep in a recliner. (*Id.*).

Tabbi's examination of Winters revealed largely normal results, except for "some imbalance" with regard to his gait and station. (Tr. 849). However, Tabbi noted that after "numerous appointments," treating sources at DENT "continue[d] to struggle to make any notable progress in improving [Winters's] dizziness and gait abnormality." (*Id.*). Tabbi opined that Winters maintained "no ability to work at this time and no anticipated ability to work in the future due to the continued severity of his dizziness," which was caused by "multiple factors." (*Id.*).

In addition, at an appointment on June 8, 2017, Tabbi similarly opined that Winters could not work due to his continuing symptoms of dizziness spells, which Winters reportedly experienced five timer per week with nausea and vomiting. (Tr. 826-27). Tabbi stated that treating sources at DENT had been "attempting to control [Winters's] symptoms for quite some time without significant improvement." (Tr. 827).

The ALJ gave these opinions "little weight" because "[s]uch opinions [were] conclusory on an issue reserved to the commissioner and [were] inconsistent with [Winters's] activity level including his ability to shop, cook, drive, go for walks, split wood, bow hunt and fish." (Tr. 20).

Finally, the ALJ gave "some weight" to state agency consultant G. Kleinerman's October 15, 2015, opinion, noting that "[e]vidence submitted at the hearing level more clearly reflects [Winters's] functional limitations." (Tr. 20 (referencing Tr. 106-16)).

8

Ultimately, the ALJ reasoned that while Winters "may experience some limitations of activity due to her [sic] physical and mental limitations . . . [t]he medical evidence, showing rather routine and conservative management of [Winters's] conditions, simply d[id] not establish physiological abnormalities, which would limit [Winters's] daily activities to the debilitating degree alleged or preclude [Winters] from performing at the [RFC] assessed above." (Tr. 20). The ALJ, after discounting all these opinions, then formed a rather highly detailed RFC and determined that Winters could perform sedentary work with various exertional and nonexertional limitations.

"While in some circumstances, an ALJ may make an RFC finding without treating source opinion evidence, the RFC assessment will be sufficient only when the record is 'clear' and contains 'some useful assessment of the claimant's limitations from a medical source.'" *Muhammad v. Colvin*, 2017 WL 4837583, *10 (W.D.N.Y. 2017) (citation omitted).

Here, the record does not clearly set forth Winters's capabilities in light of his several severe impairments, and by discounting all the medical opinions in the record, the ALJ was without a useful assessment of Winters's capabilities from a medical source. As a result, the detailed RFC was not supported by substantial evidence.

For instance, the ALJ points to Winters's "normal physical examinations" when presenting to treating physician Dr. Gregory Jehrio ("Jehrio") as evidence that Zhang's restrictive opinions were not consistent with the overall record. (Tr. 20). The ALJ notes that Winters's examinations with Jehrio revealed "no postural tremor in hands and arms bilaterally, normal finger-nose-finger, normal rapid alternative movements and rapid rhythmic movements, normal pouring test, no difficulty to rise from sitting position, no freezing, shuffling, or stooped gait, normal arm swing symmetrical and rhythmic and normal tandem walking." (Tr. 19 (referencing Tr. 902-56)). Yet it is unclear the relationship of these "normal physical examinations" to Winters's impairments, such

9

as migraines, dizziness, and anxiety, or to Zhang's opinion that stress will "certainly" cause Winters's dizziness to worsen. *See, e.g.*, *Oswald*, 2019 WL 2610711 at *7 ("Moreover, the benign examination findings noted by the ALJ – intact coordination, 5/5 upper and lower extremity strength, intact extremity sensation, normal gait and ability to ambulate without assistance device, get on and off an examination table, squat, rise from a chair with no difficulties – bear little, if any, relationship to his headache and fatigue, two of the symptoms that caused him the most significant problems."). In other words, Jehrio's examination findings provide neither clarity nor a useful assessment of Winters's limitations specific to his impairments.

Nor does Winters's activity level provide the clarity needed in this case to enable the ALJ to render an RFC without a medical assessment of Winters's limitations. Indeed, the ALJ consistently relied on Winters's stated activities of shopping, cooking, driving without difficulty, going for walks, splitting wood, bow hunting, and fishing, to show that Winters was not as limited as he alleged. (Tr. 19-20). Yet the ALJ conveniently failed to acknowledge Winters's difficulties in performing some of these activities.

For example, at the time of the administrative hearing in 2017, Winters had not cut wood in four years, since realizing that he could not do it anymore because it "rattled [him] to [his] core" and made him "feel like [he] set [him]self back." (Tr. 92-93). Moreover, at the hearing, Winters revealed that he had not bow hunted in about five years due to the resistance of the bow. (Tr. 97, 927). Winters also had trouble fishing the last time he went out on the water, as it caused him to experience dizziness, and created "some major issue." (Tr. 95, 857). In addition, Winters's dizziness and vertigo clearly affected how he approached driving, contrary to the ALJ's statement that Winters could drive "without difficulty." (Tr. 99).

Let alone the ALJ's overstatement of Winters's ability to perform these activities, in my view, these activities "hardly address the more fundamental question" of whether Winters's severe impairments "would limit his ability to do any activities on a full-time basis." *Oswald*, 2019 WL 2610711 at *7; *see also Harris v. Colvin*, 149 F. Supp. 3d 435, 445-46 (W.D.N.Y. 2016) ("a claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job.") (alterations and citation omitted).

I am also of the view that this is not a case "where the medical evidence shows relatively little physical impairment," such that the ALJ "permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *House v. Astrue*, 2013 WL 422058, *4 (N.D.N.Y. 2013) (quotations omitted). As noted by the ALJ at step two of the sequential analysis, Winters had several severe impairments, including obesity, vertigo, migraine headaches, anxiety disorder, depressive disorder, right ear hearing loss, obstructive sleep apnea, and occipital neuralgia, and the ALJ assessed a rather restrictive and detailed RFC based on these impairments. (Tr. 14, 16). Moreover, Winters received significant treatment for these longstanding impairments from multiple treating sources, perhaps indicative of the complicated nature and causes of some of the impairments. *See, e.g.*, *Zayas v. Colvin*, 2016 WL 1761959, *4 (W.D.N.Y. 2016) (ALJ could not render a common-sense judgment regarding claimant's functional capacity where claimant "had several complicated and longstanding impairments").

For all these reasons, then, the RFC in this case required a competent medical assessment of Winters's functional capabilities, either from one of the several treating sources, a medical expert, or a consultative examiner. Accordingly, by discounting all medical opinions of record,

and without ordering a consultative examination of Winters, the ALJ was left without a proper assessment of Winters's limitations, causing the ALJ to improperly render an RFC assessment based on his own lay opinion. Under the circumstances of this case, remand is required for the ALJ to resolve the gaps created in the medical record. *See, e.g.*, *Oswald*, 2019 WL 2610711 at *6-8 (where claimant suffered from severe impairments including, among other things, headaches, fatigue, and generalized anxiety disorder, RFC was not supported by substantial evidence and remand was warranted for further development of the record where ALJ substantially discounted or rejected all the opinion evidence of record, leaving the ALJ without a competent medical opinion supporting the RFC assessment).

As other courts have recognized when remand is required in similar circumstances, there are "many avenues available to the ALJ to fill the gap in the record." *Covey v. Colvin*, 204 F. Supp. 3d 497, 507 (W.D.N.Y. 2016). Here, the ALJ could request additional information from a treating source regarding Winters's functional capabilities, he could obtain a state agency consultative examination, and/or he could request an opinion from a medical expert. *See id.* On remand, then, the ALJ should further develop the record to obtain a medical opinion as to Winters's physical and mental limitations using whichever of these methods are appropriate.

The RFC is not supported by substantial evidence and remand is required for the ALJ to further develop the record. Regarding Winters's second argument, I note only in passing that I agree the ALJ at least overstated the evidence regarding Winters's ability to perform certain activities of daily living in determining that Winters could maintain work activity on a regular and continuing basis, as mentioned above. Therefore, on remand, the ALJ should also reassess the extent to which Winters can perform these activities, and how his ability to perform these activities, when accurately assessed, affects his RFC.

## CONCLUSION

For the reasons set forth above, I find that the ALJ's decision was not supported by substantial evidence. Winters's motion for judgment on the pleadings (Dkt. # 9) is **GRANTED**, the Commissioner's motion for judgment on the pleadings (Dkt. # 14) is **DENIED**, and the matter is remanded for further proceedings consistent with this decision.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
March 5, 2020.